Belcher *v.* Wickersham.

E. L. BELCHER, Adm'r, *v.* DAVID WICKERSHAM *et als.*

1. SUBROGATION. *Mortgage. Bills and notes. Administration. Insolvent proceedings. Chancery practice.* The heirs of an estate, on the assumption that it was solvent, paid off certain mortgages on lands; subsequently, on discovering their mistake, they claim to be subrogated to the rights of the mortgagors against the lands. *Held,* that if the facts and circumstances show definitely that at the time of payment such right was not intended to be exercised, or could not be exercised without injustice to others, then no such right can be held to exist. They cannot claim benefit of subrogation by any *post facto* intention, wish or interest growing out of subsequent wants. The right and intention must both concur to make a case of subrogation.

Case cited : Mitchell *v.* Mitchell, 8 Hum., 361–2.

2. SAME. *Same. Judgments and decrees. Lien.* Nor are the heirs in such case, entitled to any priority over other general creditors, because they have paid off judgments had against their intestate, during his lifetime, when the lien of the judgments so paid had expired, by not having been enforced within the twelve months provided by law.

3. SAME. *Same. Estoppel.* If the heirs have had their claims proved before the Clerk and Master, and had them allowed as simple creditors in his report, it being confirmed without exception, the court say : It is probable that this of itself would operate as an estoppel upon the heirs, as showing a purpose not to rely on the right of subrogation. The parties may come in on the footing of their claim for debts paid, by virtue of such report and its confirmation, by a decree of the court, which has not been disturbed, and cannot now be assailed.

4. SAME. *Same. Suggestion of insolvency. County Court. Per Curiam.* We held at the last term, in the case of Bryant *v.* Campbell, that by statute, suggestion of insolvency can alone be made in the County Court. But treating the suggestion as a nullity, under a bill for the administration of a complicated estate, with all parties in interest before the court, they will be bound by a decree apportioning the fund among them upon principles of equality.

---

FROM SHELBY.

---

Appeal from the Chancery Court. R. J. MORGAN, Chancellor.

E. L. BELCHER, H. G. SMITH and GEO. GANTT for complainant.

SMITH & JEFFERSON for defendant.

FREEMAN, J. delivered the opinion of the court.

James Wickersham died in Memphis, June 1866, leaving five brothers and one sister, resident in Massachusett and Ohio, as his only heirs and distributees. Administration was regularly granted on his estate at July term of County Court of Shelby county, to E. W. Wickersham. Only about $5,639 came to his hands of personal assets, but the intestate had left, what was then thought to be a splendid estate in lands and city property, estimated at from $200,000 to $250,000 in value. Wickersham, the first administrator, proceeded with his administration until April 12th, 1868, when he made a settlement, resigned and was discharged of his trust. The present complainant, E. L. Belcher, was then appointed administrator *de bonis non*, and entered at once upon the duties of his office. The original bill in this case was filed by him May 13th, 1868, and goes in its main features upon the idea of seeking a sale of real estate descended to heirs, for the payment of debts, the personalty having already been exhausted by the previous administrator properly, unless possibly some stock in the Memphis Theatre Company remained as personalty, which we need not notice or determine at present. The allegations of the bill in this feature of it, are all made in conformity to the act of 1827, ch. 54, embodied in the Code, section 2267. It contains a prayer based

on its statements, that the court will order the sale of so much of the real estate as may be proper for the purpose of paying the debts ascertained by an account, and that such debts and demands as may have been proven and allowed be paid, and for all proper orders and decrees necessary for carrying out the objects of the bill. In addition, however, to this is asked, "that to this end, the matter of the administration of said estate and all complainant's accounts and settlements as such administrator, be transferred from the County Court of Shelby to this, (the Chancery) Court," and then a prayer for such other and general relief as the nature and equity of the case may demand.

It is proper to say here, that this bill contains a history of the previous administration, together with that of a number of the largest debts due from the estate, with statement of dates and amount secured by mortgages, deeds of trust, and perhaps judgments obtained in the lifetime of James Wickersham. These creditors are made parties to the bill, and publication is asked to be made for all others having debts or demands of whatever kind against the estate, to come in and make themselves party to the proceedings for the purpose of having their claims allowed.

In this last aspect of this bill, as well as in the matter contained in its general features, it may well be taken as a bill by an administrator, in a case of complication, to administer the estate under the direction of a court of chancery, sometimes called a bill of conformity, because by it, the administrator undertakes

to conform to the decrees of the court, or the creditors are compelled to do so. See Story Eq. Jur., Vol. 1, sec. 544, and succeeding sections.

Passing from this, however, we proceed to the feature of this case which brings up the main questions to be determined by us on this appeal.

On July 1st, 1872, the heirs of James Wickersham, who were made defendants to the original bill, filed a petition in the cause, in which they set forth the matters of equity now to be determined. This petition was dismissed by the Chancellor, from which an appeal is prosecuted to this court.

We need not go into the details minutely of the matters thus stated, but will only refer to such matters as may serve to raise the questions debated before us, and raised by the record. It is proper to say here, however, that under the original bill an account of considerable indebtedness of the estate had been taken, and a portion of the lands had been ordered to be sold by special commissioners agreed on by the parties, and some of these lands had been sold in pursuance of said decree. In the meantime, in August, 1870, it had been suggested to the court, that the estate was insolvent, so that this fact may be assumed as ascertained and well known to petitioners before filing the petition of July, 1872.

This petition commences by asking that the biddings be opened as to sale of a valuable piece of property known as the old post office building, which had been bid off by Henry G. Smith at $20,000, but which had not been confirmed. They offer to advanc

the bid on said property to the sum of $23,500. They claim that the estate is indebted to them in largely more than this sum, and that they are entitled to be paid what is due them in full, whether the estate is solvent or insolvent. They offer to take the property at a cash valuation for the above sum, less taxes and charges that may be upon the same, and credit their debt with the amount. They then proceed to give the history of their claim thus set up, which is substantially as follows:

That the estate was deemed at first amply solvent, and for several years after the first administration granted. That next to the real estate, a large amount of theatre stock was deemed most valuable to the estate. That the estate, however, had turned out very differently from first calculations, owing to the depreciation in value of real estate. The estate had, however, been estimated at $200,000, while the debts up to May, 1868, were not thought to be more than $54,000. A large portion of the estate descended to the heirs was encumbered by liens, some mortgages, some deeds of trust, judgments and taxes, State, county and municipal. The theatre stock also was encumbered by two mortgages to the extent of over $11,000. There was other large indebtedness, but as petitioners say correctly, no suspicion of insolvency. We may add, on the contrary, it was thought by the heirs, that they had inherited a magnificent estate. In fact, if property had remained at its then value, it is probable it would have been a considerable estate, if pru-

dently managed, notwithstanding the large indebtedness ultimately developed.

However, to proceed, it appears that the heirs, anxious to save the real estate, in connection with and by the assent of the administrator, undertook to discharge the debts and incumbrances on the property descended to them. In carrying out this purpose, they appropriated a very large sum derived from the rents of the property, together with proceeds of a portion of the real estate which they sold, to payment of these debts. In this way and by means borrowed, they claim to have discharged upwards of $117,000 that was against the estate; of this sum they say upwards of $75,000 was obtained from rents of the property and sales of land, leaving upwards of $40,000 paid over and above the sums derived from the above sources.

This is, in substance, the statement of the petition, though the precise amounts we have not assumed to give. While claiming that the rents were not bound to have been appropriated to payment of debts, but were their own moneys, at any rate until after suggestion of insolvency, they say, they are not inclined or disposed to make any claim as to them, at least if the remainder of their claim is allowed in full. If not, however, they insist on their entire claim. The main point of their claim rests on the assumption, that they paid debts that were encumbrances fixed on the land, either by mortgage, deeds of trust, judgment, or taxes which were liens, and that these payments were made when the estate was deemed solvent by all, and being administered by the administrator as such.

We will examine these questions so far as is ne-
cessary separately, as some of them probably stand on
grounds variant from the others.    We will not go into
particulars so as to fix the time when payments were
made, for instance, on the judgments, but content our-
selves by laying down the principles on which the
rights of the parties rest in each particular case or
class of cases.

First, as to judgments had against James Wicker-
sham in his lifetime.    It will be seen, that the ground
on which petitioners stand, is the right to subrogation
to the place of creditors whose debts they have paid,
which can and does only mean, that they stand in
their places, take their shoes, as to these debts, on the
principle, as it is sometimes stated, of an equitable
assignment of the debt; that is, not an assignment
in fact made, but a payment made under such cir-
cumstances that a court of equity treats it as an as-
signment in law, and gives the party paying the ben-
efit of the debt with its securities that were in the
hands of the creditor, for his reimbursement.    This
is very clearly deducible from the statement of one
case illustrative of the application of this doctrine by
Mr. Story, Eq. Jur., Vol. 1, sec. 562.    He says:
"If a specialty creditor, whose debt is a lien on the
real estate, receive satisfaction out of the personal as-
sets of the deceased, a simple contract creditor, (who
has no claim except on these personal assets), shall in
equity stand in the place of the specialty creditor
against the real assets, so far as the latter shall have
exhausted the personal assets in payment of his debts,

and no further.    If, however," he adds, " the speciality creditor himself cannot affect the real estate, as if the heirs are not bound by the specialty, or if there is no personal covenant binding the party to pay, or if the creditors are not creditors of the same person, and have not any demand against both funds, as being the property of the same person; in these and the like cases there is no ground for the interposition of courts. of equity."

Such is the uniform statement of the principle, involving at all times the idea of substitution to the rights of another, but to nothing more.    Such is the principle administered by this court in the case of Mitchell v. Mitchell, 8 Hum., 361–2, where a legatee who had paid a judgment, or execution, which was a lien on slaves, and the right to subrogation to the right of the creditor in the case was upheld, but only to the precise rights of the creditors, as appears from the whole case, the right of the party paying one of the debts, which had not been reduced to judgment, being held only to constitute such party a simple creditor, as was the party who held the debt.    *Ibid,* 361.

This must be so on sound principle as well as authority, for the party paying the debt of another, and seeking reimbursement by way of subrogation, cannot be held to have changed the character of the debt thus paid, to have given it any more dignity by such payment, nor to have added anything to its effectiveness, as a charge upon the debtor, whose debt has been discharged.

Assuming this to be settled, the result is, that if

the lien of the judgments paid off, recovered against James Wickersham in his lifetime had expired, by not having been enforced within the twelve months provided by law, before payment by the heirs, then there was no lien to which they could be substituted by reason of such payment, and they could not create one or revive an expired one by simply paying the judgments. It is not denied in argument, we believe, that such is the fact with reference to the judgments paid off by the heirs. See L. Cases in Eq., Vol. 1, 145 *et seq.*, and cases cited.

This disposes alone of the question of priority by reason of the assumed judgment lien on this aspect of the question.

The next question presented for consideration is, as to the claim to be paid in full, based on payment of debts secured by mortgages and deeds of trust.

The property known as the post-office building and the library building, with the lots on which the houses are situated, comprise, we believe, the landed estate which was thus charged—at any rate, this property is the principal property thus encumbered by mortgage or deed of trust. The facts in reference to this property may be briefly stated as follows: J. Wickersham in his lifetime, had given various deeds of trust that need not now be specified, on this property to secure payment of large debts. In 1867, the heirs made an arrangement by which they took up the former deeds of trust, got additional time on the debts secured on the post office building, perhaps paying something on them in cash, and gave a new deed of trust on this

property to secure the amounts due. This deed was made to different trustees, and was evidently intended at the time, and did satisfy and discharge the former trust deeds on the property. They claim now, however, that having satisfied these debts, they are entitled to be substituted to the rights of the creditors thus paid, under these deeds of trust. This claim cannot be allowed on any principle which we deem sound. First, it is beyond all question, that the right to subrogation is to arise, and must grow up at the time of payment. It is a right that the party can waive if he chooses so to do. It cannot be forced on him; on payment in the case of a surety, (the most common case of subrogation), the surety has the right to stand in the place of the creditor, as to securities he may have taken from his principal, and have them enforced for his benefit, but he cannot be compelled to resort to this remedy; and Mr. Dixon, in his work on Subrogation, lays it down, "that he has option to resort to his principal directly, or to become substituted to the creditor's rights." Sec. 175. He even maintains that some act is necessary on the part of the surety, to manifest his election and to show acceptance of the right which the law gives him. Without, however, going thus far at present, we think it beyond doubt that the option, in all cases where the right of substitution may arise, is with the paying party. If the facts and circumstances show definitely, that at the time of payment, such right was not intended to be exercised, or could not be exercised without injustice to others, then no such right can be held to exist. How are the

facts here? A new deed of trust on each of these properties is given, and thus the old ones satisfied. Certainly it was not intended at the time that the last deeds should be in the nature of second mortgages, and subject to the first. But again, could the former deeds of trust have been enforced against the property after execution of the second ones? Certainly not, and why? Because the first were satisfied, cancelled, and by clear understanding of all parties were never to be held as existent charges on the property. This alone disposed of them and forever. The heirs cannot now come in and claim the benefit of them, by any *ex post facto* intention, wish, or interest which may have arisen to them, growing out of subsequent events. Such is the doctrine laid down in L. Cases in Eq., Vol. 1, p. 155, where it is said that even in case of surety, "the question whether he meant to purchase or to extinguish, is a question of fact, and not of law, it being settled that the right and intention must both concur to make a case of subrogation. Hence a payment even by a surety will be an extinguishment, and consequently preclude the right to be subrogated, if the circumstances of the case, or his accompanying declarations are such as to show that he meant to extinguish the debt, and not keep it alive for his benefit." See also *Starr* v. *Ellis*, 6 J. Ch. R., 396; *Gardner, Adm'r,* v. *Astor*, 3 J. C. R., 55. In these cases the mortgages had been paid off by the owner of the equity of redemption and assigned to him. It was held by Chancellor Kent, that they were forever extinguished, unless something had been done at

the time of taking them up, with a view that they should be kept alive. Numerous authorities might be cited to the same effect.

Here we may close this branch of the case by saying, that it is not only not shown that these parties intended to keep alive any charge on this or any other property; but on the contrary it is clearly shown, that at the time of paying them, and for years after, they had precisely the opposite purpose. This is evidenced in the clearest manner, not only by all the facts in the record, but most strikingly in the statements of the petition of the parties, in which they show, that the debts were paid with the view of relieving the estate entirely from the burden, and thus saving to the heirs what they deemed at the time a fortune, in property yielding a splendid income, as evidenced by the fact that about seventy-five thousand dollars of debts had been paid out of the rents in a few years. But, one other fact is conclusive against the parties in this view; that is, that they proved their claims before the master, had them reported on and allowed, as simple creditors, in the report filed February, 1870, which report was confirmed without exception 25th of March afterwards, and is one of the debts for which the real estate is ordered to be sold. It is probable that this of itself would operate as a conclusive estoppel upon the heirs, as showing definitely a purpose not to rely on the right of subrogation in this case.

It is insisted, however, that all this was done under a mistake of facts, and therefore cannot be held to

affect the claim now made. This cannot avail them, because it is extremely doubtful whether there was any mistake of the facts as they existed at the time; the property was then estimated at value perhaps sufficient to have justified the conclusion that the estate was amply solvent. The shrinkage in value since that period has changed all this, but this is only a misfortune to the parties, and cannot be properly used as the basis of a claim based on the idea of a mistake of facts, against which relief should be granted. In addition, it may well have been, that if the heirs had not intervened, the creditors, or the administrator, would at an early period have resorted to the real estate for the satisfaction of their debts, had it sold while prices were high, and it yielding a splendid income from rents, and thus all creditors might have been paid— probably a surplus left to the heirs.

Be this as it may, we are well satisfied with our conclusion, that they have now no right whatever to stand as preferred creditors, and be allowed to receive their claim in full, to the exclusion of other creditors of the estate. This conclusion applies equally to the theatre stock, the trusts on which they discharged, and for the same reasons.

It is proper to say, that we do not deem it necessary to review in detail the authorities cited by petitioners. We have examined them carefully, and have contented ourselves with stating what we hold to be the sound rule applicable to the case before us.

The question seems fairly before us, whether the parties are entitled to come in as other creditors of the

estate on the footing of their claim for debts paid. We think they may, by virtue of the report of the clerk alluded to allowing their claims, which has been confirmed by a decree of the court. That decree stands unreversed, and could not be reversed or reviewed now, because unexcepted to, and must stand as a conclusive adjudication of their rights on this subject.

As to the theatre stock, we hold this property must now be treated as realty belonging to the estate. The stock represented the entire property, and this has been purchased and belongs to the estate, so that the lot and building, as well as the stock representing it, are in the same hands, and the stock thus merged into the property itself. It would be absurd for the same party to hold the real estate and the stock representing it as separate properties.

The question has been presented in argument that this whole proceeding is erroneous, because of the suggestion of insolvency in the Chancery Court alone. That suggestion could alone, by statute, have been made in the County Court, as we held in the case of *Campbell* v. *Bryant et al.*, at last term. But treating it as a nullity, the bill is one well known to the forms of the court as a bill for the administration of a complicated estate, and the chancery court, under this well-settled jurisdiction, can proceed to administer the assets thus brought within its jurisdiction, and appropriate them to the payment of debts in accord with its long settled practice. If not enough to pay debts in full, all the creditors as well as heirs being before the court, and having submitted to the jurisdiction,

will be bound by the decrees and orders made in the case, apportioning the fund among them on the principle of equality. When this is done in accord with the prayer of the bill, the accounts of the administrator will be passed upon by decree of the court, and thus the administration finally settled by binding decree of a court of competent jurisdiction.

The questions made on the exceptions filed to report of the clerk and master, are not before us, as no action was taken on them by the Chancellor.

We believe this disposes of all the questions legitimately before us in the case.

A decree will be drawn in accord with this opinion. The costs of this court will be paid by the petitioners. The case will be remanded to be further proceeded in.

FREEMAN, J., delivered the following additional opinion:

We are asked to examine several questions of detail supposed to arise in this case, in order to a modification of the decree ordered in former opinion.

The case is before us alone on the matter of the petition filed by the heirs.

It is assumed that judgments paid before the twelve months in which the lien existed, are not included in the decision made. This is a mistake. The first proposition on this question refers to payments of judgments made after lien expired, it is true; but the more general propositions of the balance of the opinion

Belcher *v.* Wickersham.

cover all cases of the kind where substitution might be sought. The principle is, that it is at the option of the party praying, in a proper case, whether he claim substitution or not; and that the facts show clearly this was not proposed, but the contrary, that it was a payment of a charge on the land, by the owners as owners and for their own benefit, voluntarily made, with the purpose of finally extinguishing all liens and not of continuing the charge on the property. This includes all payments made by the heirs as far as we can see, except amount paid for theatre stock. All we find in the petition in reference to this stock is, that the heirs claim to have purchased it for the estate, and yield the estate in their petition. They do not ask any reimbursement for it in the petition, but by fair implication it is excluded from the petition as a claim, by confining the relief sought expressly to the matters specified.

We need not discuss this question, as it is not before us in a form to further authorize its decision on the petition from which the appeal is prayed.

As to costs of this court, on reflection, we think they may well be charged to the administrator, or the estate rather in his hands, as petitioners have succeeded in modifying the decree of the Chancellor, which simply dismissed it.

With this change, the decree will be drawn as directed in former opinion.